**John DOE, Plaintiff–Appellee,**

v.

**VILLAGE OF CRESTWOOD, ILLINOIS, and Chester Stranczek, Mayor of the Village of Crestwood, in his official capacity, Defendants–Appellants.**

No. 90–2735.

United States Court of Appeals, Seventh Circuit.

Submitted Aug. 11, 1990.

Decided Aug. 11, 1990.

Opinion Oct. 26, 1990.

Rehearing and Rehearing In Banc Denied Jan. 7, 1991.

Harvey M. Grossman, Alan K. Chen, Jane M. Whicher, Roger Baldwin Foundation, Chicago, Ill., for plaintiff-appellee.

Thomas K. McQueen, Barry Levenstam, Daniel Lynch, Stuart N. Rappaport, Jenner & Block, Chicago, Ill., for defendants-appellants.

Before COFFEY, FLAUM and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

"A Touch of Italy" in the Village of Crestwood, Illinois, is a municipal festival in its second year. The Village has sponsored a Polish festival for six years. Sometime during each festival, a mass has been celebrated—in Polish during the Polish festival, in Italian during "A Touch of Italy". John Doe, a pseudonymous resident of Crestwood offended by the religious observance, filed this suit on Friday, August 10, 1990, the first day of this year's Italian festival, seeking an injunction against the celebration of the mass, scheduled for 4:00 p.m. the next day. Late Friday afternoon the district judge held a hearing and stated that the mass would be enjoined. A temporary restraining order issued Saturday morning.

Although 28 U.S.C. § 1292(a)(1) does not authorize appeals from temporary restraining orders, *San Francisco Real Estate Investors v. Real Estate Investment Trust of America*, 692 F.2d 814, 816 (1st Cir.1982); *Stricklin v. University of Wisconsin*, 420 F.2d 1257, 1259 (7th Cir.1970), the order forbidding the observance of mass is not properly characterized as a "temporary" restraint. Drawing a line between appealable preliminary injunctions and non-appealable TROs makes sense when the TRO holds things in stasis to facilitate an orderly decision. Appellate consideration of such an interim step might disrupt the review the order was supposed to permit, and TROs are so short in duration that an appeal commonly could not be completed before their expiration. Better to allow things to proceed in the district court than to fight at length about the brief interlude until a decision may be rendered on the merits. Nomenclature does not determine whether an order is a preliminary injunction, however, *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987); *Sampson v. Murray*, 415 U.S. 61, 86–88, 94 S.Ct. 937, 951–52, 39 L.Ed.2d 166 (1974), and the name attached to this order is imprecise. It does not create a little delay pending decision. Rather it forbids the mass, which will not be rescheduled. No further proceedings in the district court concerning this mass are in prospect. All questions concerning the 1990 festival have been wrapped up, leaving only the plaintiff's request for an injunction against recurrence. This order is an "injunction" within the meaning of § 1292(a)(1), and the notice of appeal therefore invokes our jurisdiction. *Belknap v. Leary*, 427 F.2d 496, 498 (2d Cir.1970); see also Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Eugene Gressman, 16 *Federal Practice and Procedure* § 3922 (1977 & 1990 Supp.) (collecting cases).

■ Caesar Park, a public park in Crestwood, is the home of the Festival. A "Beer Garden tent" in the Park houses several of the Festival's activities, including concerts each evening from August 10 through 12. Crestwood Women's Club, which was formed in 1931, holds the license under which the Beer Garden sells its liquor. An employee of the Village who is also a member of the Club invited Father Angelo Biancalana, a Roman Catholic priest, to celebrate mass in the tent on Saturday afternoon. According to the verified complaint this service, which the Village calls an "Italian Mass" because it will be said in Italian, will include the customary prayers and Eucharist of the Roman Catholic church. An altar will be installed in the Beer Garden tent for the occasion; plans call for display of a cross and lighted candles. Plaintiff does not contend, however, that any of the costs of this service will be borne by the Village. Doe represents that he will stay away from the Festival while the mass is underway. But for the mass, the tent would be used as a beer garden between the opening (3:00 p.m. Saturday) and the first concert of the evening, so Doe suffers the same kind of injury as the plaintiff in *ACLU v. City of St. Charles*, 794 F.2d 265, 267–69 (7th Cir. 1986), and has standing.

■ Crestwood not only owns the Park but also sponsors the Festival. The Park is a public forum. If the Festival, too, is open to private groups that wish to participate, and if the Crestwood Women's Club (or a church) were the sponsor of the mass, it would be difficult to find an obstacle in the establishment clause of the first amendment. Music acts, cultural exhibits, food booths, bingo, and the like attest the scope of the Festival. A government may not close its public forums to religious practice by private parties. *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Fowler v. Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953). Although the holding of a mass in a public park creates a possibility that some members of the public will assume sponsorship (as opposed to acquiescence) by the polity, the government's obligation not to discriminate against religious speech in circumstances in which secular speech would be allowed prevails. See *O'Hair v. Andrus*, 613 F.2d 931 (D.C.Cir. 1979) (Pope may hold a mass on the Mall, despite the substantial costs of crowd control and cleanup, when the Park Service bears similar costs for secular demonstrations).

■ Owning a public forum is one thing, sponsoring a mass quite another. A religious service under governmental auspices necessarily conveys the message of approval or endorsement. Prevailing doctrine condemns such endorsement, even when no private party is taxed or coerced in any way. *Allegheny County v. ACLU*, —— U.S. ——, 109 S.Ct. 3086, 3100–01, 106 L.Ed.2d 472 (1989); *American Jewish Congress v. Chicago*, 827 F.2d 120, 128 (7th Cir.1987); *City of St. Charles*, 794 F.2d at 270–71. See also *Gilfillan v. Philadelphia*, 637 F.2d 924 (3d Cir.1980) (Pope's mass in a public park is an unconstitutional endorsement of religion when the city pays for the construction of the altar).

This is so even when the endorsement takes place in company with secular events, such as the foods, crafts, and entertainment offered at the Festival. Both *Allegheny County* and *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), hold that government may display a religious symbol (a menorah in *Allegheny County*, a crèche in *Lynch*) without endorsing religion when the context demonstrates that the government is not taking a stance. Two contexts mattered—first the season, for in each case the government was displaying the symbols appropriate to the time of year; second the immediately surrounding symbols, for in each case the government was displaying an assortment of symbols appropriate to all aspects of the holidays. Christmas and Hanukkah are secular as well as religious holidays; to use symbols appropriate to all aspects of the occasion is not to endorse a particular religion. *Mather v. Village of Mundelein*, 864 F.2d 1291 (7th Cir.1989). If Christmas may be a secular holiday, the state may recognize whose birthday is being commemorat-

ed. Under the approach of *Allegheny County, Lynch,* and *Mundelein,* even a herd of reindeer and a forest of jumbo candy canes could not neuter a mass—a religious observance that does substantially more than mark the birth of a figure with religious significance. The mass celebrates the life, teachings, death, resurrection, and Ascension of Jesus; it is an occasion for worship, not for putting a holiday in a historical context that happens to be religious. If secular symbols could not remove the implication of endorsement from a mass at Christmas (and we believe they could not), then food, beer, and bingo are insufficient to render a mass "secular". Although the seat of the Roman Catholic Church is in Rome, Christianity is not distinctively Italian, and homage to Italian culture and food does not imply religious observance. When the Court held that a state legislature may open with prayer, it did so because of the deep roots of the practice, not because prayer in the context of legislation is secular. *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). Celebration of the Eucharist is a significant step beyond a short, non-denominational prayer.

So everything turns on who is putting on this mass. Is it the Village, or is the church or a private club sponsoring a mass in the Village's public forum? The district court found that the Village is the sponsor, and we do not believe this to be clearly erroneous. Doe's verified complaint states that the Village is the sponsor. The Village concedes that one of its employees selected and recruited the priest. An article in a newspaper published by the Village bears the headline: "**Italian Mass to be celebrated at our Italian Fest**". As the district judge emphasized, "our" implies that the mass and Festival alike are under the Village's sponsorship. The article does not mention the Crestwood Women's Club. A display in the same issue touts the Festival; an inset box inveigled the reader to "Join Us for a Traditional Italian Mass Celebration at 4 p.m.—Sat., August 11th. No admittance charge for Mass." Apparently "us" is the Village, the only identified sponsor. We reprint the display as an appendix to this opinion.

Perhaps additional materials would show that the Crestwood Women's Club is the true sponsor of the mass. The Village's attorney represented to the district judge that it is. But the Village did not produce any publicity materials showing that the Club sponsors the mass and that the Village offers only a public forum—one that would have been equally open to an opera or other secular event. All information in the Village's paper would lead an objective observer to conclude that the Village itself is the sponsor, or at least *a* sponsor. So the district judge was entitled to conclude that the Village has endorsed Christianity, if not Roman Catholicism in particular, and under *Allegheny County* it may not do so.

Doe wants an injunction against religious services at future festivals in Crestwood. We assume that the district judge will take evidence and make more detailed findings concerning the sponsorship of the mass and what, if anything, the Village has done (or could do) to demonstrate that it is providing a public forum but not endorsement. Nothing we say in this opinion prejudges that inquiry. On this slim record, however, the district judge's conclusions cannot be found clearly erroneous. The injunction against the mass scheduled for 4:00 p.m. on August 11, 1990, is

AFFIRMED.

APPENDIX

COFFEY, Circuit Judge, dissenting.

If I believed this case involved a government endorsement of Roman Catholicism as alleged by the plaintiff, I would join the majority's opinion. Even so, the celebration of the mass at issue would have fallen far short of demonstrating a government endorsement of religion; it was to be a distinctively *Italian* mass conducted in the national language of Italy for the purpose of portraying an Italian tradition in the context of a festival celebrating the Italian heritage of many of Crestwood's residents. The majority somehow approves the trial court's reaching out into space to bring this constitutionally acceptable expression of Italian culture into the ambit of an Estab-

lishment Clause problem; there was no danger of this celebration of the mass being perceived by a *reasonable observer* as an attempt by the Village of Crestwood, Illinois to establish Roman Catholicism as the official religion. *See County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter,* —— U.S. ——, 109 S.Ct. 3086, 3103, 106 L.Ed.2d 472 (1989) ("the question is 'what viewers may fairly understand to be the purpose of the display.'") (citation omitted); *Id.* at 3115 ("the constitutionality of [a display's] effect must also be judged according to the standard of a 'reasonable observer.'") (opinion of Blackmun, J.); *Witters v. Washington Dept. of Serv. for the Blind,* 474 U.S. 481, 493, 106 S.Ct. 748, 755, 88 L.Ed.2d 846 (1986) ("No reasonable observer is likely to draw from the facts before us an inference that the State itself is endorsing a religious practice or belief.") (O'Connor, J., concurring in part and concurring in the judgment).

Rather than preventing a government endorsement of religion, this suit, instead, is a clear attempt by the plaintiff to force the government to build an absolute wall of separation between church and state that would preclude the public expression of religious beliefs. Such an absolute wall is neither practical nor desirable, and it has no basis in history or modern First Amendment jurisprudence. As the Supreme Court noted in *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984),

"The concept of a 'wall' of separation is a useful figure of speech probably deriving from views of Thomas Jefferson [expressed in his letter to the Danbury Baptist Association].[] The metaphor has served as a reminder that the Establishment Clause forbids an established church or anything approaching it. But *the metaphor itself is not a wholly accurate description of the practical aspects of the relationship that in fact exists between church and state.*

"No significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all the other parts, much less from government. *'It has never been thought either possible or desirable to enforce a regime of total separation.'*"

*Id.* at 673, 104 S.Ct. at 1359 (footnote and citation omitted) (emphasis added). The "wall" of separation theory was further criticized by then Justice Rehnquist in his *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) dissent:

"It is impossible to build sound constitutional doctrine upon a mistaken understanding of constitutional history, but unfortunately the Establishment Clause has been expressly freighted with Jefferson's misleading metaphor for nearly 40 years. *Thomas Jefferson was of course in France at the time the constitutional Amendments known as the Bill of Rights were passed by Congress and ratified by the States.* His letter to the Danbury Baptist Association was a short note of courtesy, written 14 years after the amendments were passed by Congress. *He would seem to any detached observer as a less than ideal source of contemporary history as to the meaning of the Religion Clauses of the First Amendment.*"

*Id.* at 92, 105 S.Ct. at 2508. Thus Justice Rehnquist rejected the idea that Jefferson's Danbury Letter is controlling authority for the meaning of the First Amendment and looked instead to the views of James Madison, a leading member of the first Congress. After a thorough review of Madison's role in the adoption of the First Amendment, Justice Rehnquist concluded that Madison's view of the Religion Clauses is far more relevant to their meaning than is Jefferson's third-party interpretation given 14 years after the fact:

"It seems indisputable from these glimpses of Madison's thinking, as reflected by actions on the floor of the House in 1789, that he saw the Amendment as designed to prohibit the establishment of a national religion, and perhaps to prevent discrimination among sects. *He did not see it as requiring neutrality on the part of government between religion and irreligion.*"

*Id.* at 98, 105 S.Ct. at 2511 (emphasis added). Further proof that Madison "did not

see [the First Amendment] as requiring neutrality" is found in the fact that

> "as a member of the First Congress, [Madison] raised no recorded objection when that body on September 25, 1789, the same day it approved the First Amendment, petitioned President George Washington to issue a proclamation of a national day of prayer and thanksgiving; and, most importantly, as the nation's chief executive, Madison issued at least four presidential thanksgiving day proclamations."

D. Dreisbach, *Real Threat and Mere Shadow: Religious Liberty and the First Amendment* 111 (1987). In view of the actions of the first Congress on the same day it approved the First Amendment, the first Congress also saw the First Amendment as far less than an absolute wall of separation between the state and religion. As I have noted before,

> "It is clear from the historical evidence that the Establishment Clause was designed to prevent only the establishment of a *religion*, be it the Baptist faith, Lutheranism, Methodism, Episcopalianism, Judaism or Catholicism. It was never intended to prohibit government from taking actions, and government has not refrained from taking actions, which might have a minimal *religious* significance to persons of any faith or no faith, but do not 'in reality ... establish a religion ... or tend[ ] to do so.' *Lynch*, 465 U.S. at 678, 104 S.Ct. at 1362."

*Mather v. Village of Mundelein*, 864 F.2d 1291, 1295 (7th Cir.1989) (Coffey, J., concurring). It should be abundantly clear to any *neutral* and *detached observer* that the authentic Italian mass scheduled as part of the "Touch of Italy" festival cannot be considered as "in reality ... establish[ing] a religion ... or tend[ing] to do so."

The issue before us is whether the inclusion of an ethnic religious service of 45 minutes' duration at a government-sponsored ethnic festival that spanned three days (72 hours) violates the Establishment Clause of the First Amendment. I would hold that it is entirely proper for the government to include the religious aspect of an ethnic culture when presenting the traditional aspects of that culture in a festival. Furthermore, under the facts before us, I would hold that the Village of Crestwood was not the sponsor of the authentic Italian mass enjoined by the district court. This Court should have granted the stay of the district judge's temporary restraining order.

## I. VILLAGE ENDORSEMENT OF ROMAN CATHOLICISM

*Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), still provides the relevant test for whether government statutes or practices that relate to religion are constitutional.

> "Under the *Lemon* analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance or inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion."

*Allegheny*, 109 S.Ct. at 3100 (citing *Lemon v. Kurtzman*, 403 U.S. at 612–13, 91 S.Ct. at 2111). The majority advisedly addresses only the second prong of the *Lemon* test, that government action may "not advance nor inhibit religion in its principal or primary effect." Under the Supreme Court's interpretation of this test in *Allegheny*, the question is whether the government action "has the effect of endorsing religious beliefs." *Id.* at 3103.

I disagree that "[a] religious service under governmental auspices necessarily conveys the message of approval or endorsement." Majority Opinion at 1478.[1] As in the crèche cases, government endorsement depends upon the context. *See County of*

---

**1.** The majority cites *Gilfillan v. Philadelphia*, 637 F.2d 924 (3d Cir.1980), for the proposition that "[p]revailing doctrine condemns such endorsement, even when no private party is taxed or coerced in any way." *Gilfillan* is inapposite to that proposition because in *Gilfillan* the City of Philadelphia had paid for the construction of an altar for a mass conducted by the pope in a public park.

*Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter,* — U.S. ——, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). No one would suggest that a government-sponsored funeral for a deceased president, such as the Roman Catholic funeral service for President John Fitzgerald Kennedy, could be perceived as the government's endorsement of the president's religion. On the contrary, anything less would be perceived as inappropriate government hostility toward that religion. The Roman Catholic mass that was performed at JFK's funeral was natural and entirely appropriate in the context of a funeral service for a deceased Roman Catholic president. Even if the government had not incurred any expenses in arranging for the mass, the trappings of a presidential funeral certainly conveys the message of government sponsorship of that funeral far. more than does the Village of Crestwood's inclusion of a mass in an Italian festival.[2]

Likewise, an authentic Italian mass, recited in Italian, is natural and entirely appropriate in the context of the "Touch of Italy" festival, even if the mass were government sponsored (from the record I am convinced it was not, but I will temporarily concede government sponsorship for the sake of argument—*see infra,* section II). The "Touch of Italy" festival featured a weekend celebration of Italian culture, heritage and ethnicity. The Village had planned Italian entertainment with Italian music and comedy, Italian sporting events featuring bocce ball, Italian food and drink, and displays celebrating Italian culture. In view of the pervasive role of Roman Catholicism in Italian culture, a presentation of Italian culture that is purely secular would, according to a *reasonable person,* be considered most inaccurate and inappropriate. Indeed, the governmental exclusion of such a prominent part of Italian culture would, according to a reasonable mind, more likely be perceived as hostile to Roman Catholicism because "[a]lmost all Ital-

ians are Roman Catholic." *The New Columbia Encyclopedia,* 1380 (W. Harris & J. Levey ed. 1975). Including an authentic Italian mass in an Italian festival to provide an accurate portrayal of Italian culture, therefore, fails to communicate a "message of approval or endorsement."

In the context of the Italian festival, even if an authentic Italian mass were sponsored by the government, it would merely be an official acknowledgement of the religious aspect of Italian culture in a manner similar to traditional acknowledgments to the proper role of religions in American life. I have previously noted that such official acknowledgments of religion were declared constitutional by the Supreme Court in *Lynch v. Donnelly:*

> "In *Lynch* Chief Justice Burger, writing for the Court, observed that: 'There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789.' 465 U.S. at 674, 104 S.Ct. at 1360. Examples of this historical acknowledgment were cited which included Executive Orders recognizing religiously grounded national holidays, the presence of religiously oriented work in publicly supported art galleries, and the printing on our currency of the national motto 'In God We Trust.' *Id.* at 675–77, 104 S.Ct. at 1360–61. To the examples cited by the Court, one could add the oaths taken by office-holders and witnesses in judicial proceedings, each of which recognize the existence of a deity, and the prayers of soldiers in combat or members of athletic teams prior to athletic contests in a public facility."

*Mather v. Village of Mundelein,* 864 F.2d at 1293–94 (Coffey, J., concurring). I fail to understand the challenge to the constitutionality of acknowledging the traditional role of Roman Catholicism in Italian culture when government may (and should) acknowledge the traditional role of religion in American culture in such a variety of ways.

---

**2.** Military chaplains of various religious persuasions receive a government salary and conduct services regularly under government sponsorship, but that is not considered a government establishment of religion either.

In *Lynch v. Donnelly*, Chief Justice Burger, joined by Justices White, Powell, and then Justice Rehnquist, made the cogent observation that *"[f]ocus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause." Lynch v. Donnelly*, 465 U.S. at 680, 104 S.Ct. at 1362 (emphasis added). The Court then went on to hold that

> *"[t]he District Court plainly erred by focusing almost exclusively on the crèche.* When viewed in the proper context of the Christmas Holiday season, it is apparent that ... there is insufficient evidence to establish that the inclusion of the crèche is a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message."

*Id.* (emphasis added). The majority makes the same error here when *focusing exclusively on the nature of the mass,* as it does (traditional Eucharist, alter, cross and candles of the Roman Catholic church), rather than on how the authentic Italian mass relates to the expression of traditional Italian culture surrounding the mass. Given the predominately Roman Catholic tradition of Italy, the observance, for example, of a Baptist, or Episcopalian, or Jewish, or Presbyterian or Unitarian service in an authentic Italian festival would be misplaced regardless of the sponsor, for these religions are not integral parts of Italian culture. Indeed, they are so foreign to Italian culture that their presence at an Italian festival would raise a reasonable suspicion that the other religion was being promoted by the festival sponsors. In contrast, an authentic Italian mass merges and blends into the background of the other Italian aspects of Italian life, and thus the mass is an indispensable part of a complete tapestry.

Because of their mistaken focus on the nature of the mass, the majority in a sarcastic slap at a religious tradition concludes that "even a herd of reindeer and a forest of jumbo candy canes could not neuter a mass...." Majority Opinion at 1478–79. Neither *Lynch* nor *Allegheny*, however, requires that the context of a government exhibit or action neutralize its religious character. Indeed, the *Lynch* majority specifically denied that it viewed the crèche as having only secular meaning:

> "Justice Brennan states that 'by focusing on the holiday "context" in which the nativity scene appears,' the Court 'seeks to explain away the clear religious import of the crèche' ... and that it has equated the crèche with a Santa's house or reindeer.... Of course this is not true."

*Lynch v. Donnelly*, 465 U.S. at 684, n. 12, 104 S.Ct. at 1365 n. 12. In her *Lynch* concurrence, Justice O'Connor says that "[a]lthough the religious and indeed sectarian significance of the crèche, as the District Court found, is not neutralized by the setting, the overall holiday setting changes what viewers may fairly understand to be the purpose of the display...." *Id.* at 692, 104 S.Ct. at 1369. Just as the "overall holiday setting change[d] what viewers may fairly understand to be the purpose of the display" in *Lynch*, the Italian festival setting changes what viewers may fairly understand to be the purpose of the authentic Italian mass said in Italian—the purpose of the mass was to portray a traditional part of Italian culture. And as in *Lynch*, "there is insufficient evidence to establish that the inclusion of the [mass] is a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of [Roman Catholicism]." *Id.* at 680, 104 S.Ct. at 1363.

*Allegheny* seems to have changed the contextual emphasis from *Lynch*'s focus on a créche's holiday setting to the specific physical setting of the crèche. The *Lynch* majority had found that a crèche gave no message of government advocacy of a particular religion when the crèche is in the "context of the Christmas Holiday season," *Lynch v. Donnelly*, 465 U.S. at 680, 104 S.Ct. at 1363, but the *Allegheny* court found that a crèche standing alone had the effect of endorsing a religious message. *County of Allegheny*, 109 S.Ct. at 3103–04. *Allegheny* emphasizes that the physical surroundings of a display determines whether it has the effect of conveying the

impression that the government endorses a particular religious view.[3]

The Supreme Court's seeming change in emphasis from the seasonal context to the specific physical context, however, falls far short of transforming the Italian mass at issue into a government endorsement of Roman Catholicism, as the trial judge, with the support of the majority, seems bent on accomplishing.[4] All of the physical surroundings of the proposed mass (Italian music, Italian comedy, Italian sporting events, Italian food and drink, and Italian cultural displays) attested the Italian nature of the ethnic festival. Thus, a 45-minute authentic Italian service would have merely been one very small segment of the community's primarily secular portrayal of Italian culture. Instead of the inclusion of an authentic Italian mass demonstrating government endorsement of Roman Catholicism, the government's prohibition of an exhibition of such a traditional part of Italian culture at an Italian festival conveys a loud and clear anti-religious message of disapproval of public expressions of religion. Why? I thought we were a nation "under God with liberty [to practice our own religion] and justice for all." Showing hostility toward religious expression is particularly inappropriate in this nation since one of the Pilgrims' primary interests in founding it was to gain religious freedom. Government conduct that has the effect of disapproving religious beliefs or showing hostility toward religion is every bit as constitutionally objectionable as conduct endorsing religious beliefs. *Cf. County of Allegheny v. American Civil Liberties Union*, 109 S.Ct. at 3103.

The only way to ensure government neutrality toward religion is to allow all faiths whether in groups or as individuals to express their religious beliefs, or lack thereof, freely. Caesar Park in Crestwood, Illinois is a public forum that is open to all kinds of speech, including festivals celebrating the cultural heritage of ethnic groups, subject only to reasonable time and manner restrictions. The majority recognizes that Caesar Park is a public forum and that a religious practice or event may not be excluded from such a forum on the basis of the religious content of the speech involved. *Widmar v. Vincent*, 454 U.S. 263, 269–70, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981) ("In order to justify discriminatory exclusion from a public forum based on the religious content of a group's intended speech, the [government] ... must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."); *Fowler v. Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953). But the majority also states that because the Village is sponsoring the Italian festival, the festival too must be open to all types of religious services in order for the celebration of the authentic Italian mass to be permissible. The majority reasons that if the mass were sponsored by a private organization and the festival were open to other private groups (no evidence was presented to demonstrate that the Village prohibited other private groups from making presentations on the festival grounds), the mass would pass constitutional muster. This reasoning is rather specious because, as I noted above, nontraditional religions would be out of place in an Italian festival (just as Irish or Polish music or dances would be out of place at a Chanukah celebration). It is the park (i.e. the public forum) that must be open to all kinds of speech. Once the city has decided to use the park for a specific purpose, such as an ethnic festival, all activities that are inconsistent with the purpose of the festival may properly be

---

3. Justice Blackmun stood apart from the other eight justices in his conclusion that a menorah standing beside a Christmas tree is drained of religious significance. *County of Allegheny*, 109 S.Ct. at 3114 (Blackmun, J.). Thus, *Allegheny* did not overturn the proposition, derivable from *Lynch*, that the religious significance of a government display need not be neutralized by its setting. *Lynch v. Donnelly*, 465 U.S. at 685,

104 S.Ct. at 1365 (Majority Opinion), 692, 104 S.Ct. at 1369 (O'Connor, J., concurring).

4. Even if there were government sponsorship of the mass, the diminutive degree of sponsorship in this instance—an advertisement in the Village newspaper—fails to convey a message of Village endorsement of Roman Catholicism. See section II *infra*.

excluded, and all activities that further the secular purpose of the festival may properly be included. In this instance, the secular purpose of conveying a broad panorama of Italian culture is enhanced by including an authentic Italian mass. The remote possibility that the Roman Catholic church may receive some incidental benefit from having an authentic mass included in a festival for the purpose of portraying the religious heritage of the ethnic culture fails to implicate the constitution. In *Board of Education of Westside Community Schools v. Mergens*, —— U.S. ——, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), Justice O'Connor recently observed that "although incidental benefits accrued to religious groups who used university facilities [in *Widmar*], this result did not amount to an establishment of religion." *Id.* at 2371 (plurality opinion). Nor does the inclusion of an ethnic religious service in the context of a celebration of the ethnic cultural heritage "confer any imprimatur of state approval on religious sects or practices" (*Widmar*, 454 U.S. at 274, 102 S.Ct. at 276) because the average citizen will perceive such services as part of the expression of the heritage of the ethnic culture.

> "Indeed, the message is one of neutrality rather than endorsement; *if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion.* 'The Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities.' *McDaniel v. Paty*, 435 U.S. 618, 641, 98 S.Ct. 1322, 1335, 55 L.Ed.2d 593 (1978) (BRENNAN, J., concurring in judgment)."

*Mergens*, 110 S.Ct. at 2371 (plurality opinion) (emphasis added). The Village of Crestwood has opened Caesar Park to the portrayal of a broad variety of the secular aspects of the Italian heritage and culture at the Village's expense. The refusal to allow the inclusion of a portrayal of the traditional Italian religion—a mass said in Italian by an Italian-speaking priest—at the expense of private parties (the Crestwood Women's Club) certainly "demonstrate[s] not neutrality but hostility toward religion."

Last year in *Mather v. Village of Mundelein*, 864 F.2d 1291 (7th Cir.1989), we recognized that *the constitution does not require the government to suppress the religious dimension of holidays such as Christmas that have both secular and religious aspects.*

> "The Constitution does not simultaneously allow the state to declare a holiday in honor of this religious event [Christmas] and command it to pretend that the day has only secular meaning, or allow it to sponsor a display but compel it to hold the icons at a symbolic arm's length by moving them to the other side of the street. If there may be a holiday, and a display, at all, there is no constitutional virtue in the ten-foot pole. *Governments display the appropriate symbols for other occasions; the holiday celebrating the life of Rev. Martin Luther King, Jr., brings readings from his sermons, unabashedly sectarian in nature. When the government speaks but does not compel others to worship or penalize those with different views, there is no serious threat to religious freedoms.*"

864 F.2d at 1298 (Easterbrook, J., concurring). Similarly, if a government entity may promote the celebration of an ethnic culture that has predominate religious aspects, the constitution does not mandate that the government pretend the ethnic culture has only secular dimensions. *The government may constitutionally recognize the religious aspects along with the secular.* Indeed, in the same manner that "[g]overnments [may] display the appropriate symbols for other occasions," the Village may allow the celebration of a Catholic mass as a symbol of traditional Italian culture. The plaintiff argues in his Response to Appellants' Emergency Motion for a Stay Pending Appeal that the mass could be moved to a church rather than be canceled. Just as the constitution does not require "moving [religious icons] to the

other side of the street" from a government Christmas display, neither does it require that the recognition of an ethnic culture's religion be isolated from a government-sponsored celebration of the cultural heritage. Of course all crèches could be placed on church property, and the authentic Italian mass could always be held in a Roman Catholic church · (where it was forced to relocate this time). But just as a Christmas crèche may occupy a place on government property in the context of a general Christmas display, an authentic Italian mass may be conducted on public property in the context of an Italian festival without implying governmental endorsement of the Italian religion to a *reasonable, unbiased mind*. Furthermore, presenting the religious as well as the secular aspects of the Italian culture is analogous to the government's presentation of Martin Luther King, Jr.'s religious sermons along with his secular speeches. No one would suggest that a balanced presentation of Martin Luther King, Jr.'s speeches demonstrates a governmental endorsement of his religious beliefs, and, indeed, a balanced presentation of a person's views or heritage cannot constitute governmental endorsement.[5] As Chief Justice Burger observed in *Lynch*,

"In our modern, complex society, whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court.

"Rather than mechanically invalidating all governmental conduct or statutes that confer benefits or give special recognition to religion in general or to one faith—as an absolutist approach would dictate—the Court has scrutinized challenged legislation or official conduct *to determine whether, in reality, it establishes a religion or religious faith, or tends to do so.*"

*Lynch v. Donnelly*, 465 U.S. at 678, 104 S.Ct. at 1361–62 (emphasis added). An authentic Italian mass in the context of an Italian festival could not possibly be construed by a *reasonable observer* as tending "in reality [to] establish[ ] a religion or religious faith" or to constitute a governmental endorsement of religious beliefs. *See County of Allegheny*, 109 S.Ct. at 3103.

The authentic Italian mass that was to have been conducted at the "Touch of Italy" festival easily meets the other two prongs of the *Lemon* test. The first prong of the test is that the activity must have a secular purpose. The test does not require that the practice have an *exclusively* secular purpose, only a secular purpose. *See Lynch v. Donnelly*, 465 U.S. at 681, n. 6, 104 S.Ct. at 1363, n. 6. The purpose of the Italian mass was to complete the picture of Italian culture presented by the primarily secular Italian fest as well as to draw additional patrons to the "Touch of Italy" festival.[6] Hence, it passes this test of having a secular purpose. The final prong of the *Lemon* test, the avoidance of excessive government entanglement is likewise easily met. In *Lemon* there would have been "comprehensive, discriminating, and continuing state surveillance" of the religious content of the education in a private school. *Lemon v. Kurtzman*, 403 U.S. at 619, 91 S.Ct. at 2114. In contrast, the only government involvement in the authentic Italian mass was an advertisement, included within an advertisement for the rest of the festival, in the Village newspaper, and the recruitment of an Italian-speaking priest by

**5.** The majority somehow finds the same balanced presentation of Italian culture unconstitutional. I fail to comprehend how the majority can on one hand make such a rigid application of the Establishment Clause to the Village's festival and then shift gears and go in reverse and view the celebration of Martin Luther King, Jr.'s birthday in a rational, unbiased, reasonable manner.

**6.** Roman Catholics are required to attend mass either late on Saturday afternoon or evening or on Sunday. *1990 Catholic Almanac* 219 (F. Foy & R. Avato ed.). Thus the celebration of an authentic Italian mass at 4:00 p.m. on Saturday

a Village employee.[7] All other aspects of the mass were planned by the Crestwood Women's Club, and all materials and expenses incurred for the celebration of the mass were paid for by the Women's Club, without the expenditure of any public funds. Thus, there is no continuing involvement or entanglement like there was in *Lemon.*

## II. VILLAGE SPONSORSHIP OF THE ITALIAN MASS

The foregoing has assumed for the sake of argument a point I do not concede, Crestwood's sponsorship of the authentic Italian mass. The district judge based his findings of Village sponsorship of the mass solely on the publicity provided in the Crestwood Adviser, the Village newspaper. He found that the

> "Village's explicit and unambiguous sponsorship of a sectarian religious service as part of a Village-sponsored festival has an impermissible religious effect.... Here, not only has Village promoted the Italian fest as a Village-sponsored event, but it also has *singled out* the mass from the other festival activities and invited people to 'Join Us' for that service in an indisputably official government publication, the *Crestwood Adviser.* This message conveyed in the *Adviser* closely identifies Village with the practices of a particular sect in the Christian religion, and clearly has an impermissible religious effect."

TRO at 7–8 (emphasis added). This finding gives far too much emphasis to a small block of advertisement less than three-quarters of an inch by one and a half inch in the context of what appears to have been more than a half-page promotion of the festival. The block advertising the "Traditional Italian Mass" was the smallest advertising block on the page. Furthermore, the ad does not "single out" the mass for a special invitation. The adver-

tisement also invited the public to "Join Us for 3 Evenings of Superb Entertainment" in the headline advertising the festival, and the advertisement for a free concert said, "You are invited to be our distinguished guest...." Thus, the Village was promoting the festival, not one single aspect of it, and the advertisement fails to "closely identif[y] Village with the practices of a particular sect in the Christian religion." The district judge, interpreting the same record before us, also somehow found that the Village had "prominently featured and promoted the Roman Catholic mass, in an explicit and unambiguous manner" because the newspaper carried a one-column headline (to promote Saturday night attendance) stating "Italian Mass to be celebrated at our Italian Fest."[8] TRO at 6. The description below the headline occupied only five lines of ordinary news type, apparently out of a full page (the complaint failed to give the page number or the context of the news report), and the report was not on the page advertising the festival. This is far from an "explicit and unambiguous sponsorship of a sectarian religious service" and far from the government's having "clearly singled out the religious aspect of a government event or display" for government promotion. TRO at 7–8. Indeed, at the hearing the Village alleged, and the plaintiff did not deny, that the mass was entirely planned and paid for by the Crestwood Women's Club:

> [VILLAGE ATTORNEY]: "Judge, the Crestwood Women's Club ... has principal responsibility over the Mass.... "All of the materials used for the mass are being donated by parishioners, not City donations. That will include a table, bunting about the table, glasses, dishes and so forth, all service related and those are all coming from members of the Women's Club none from the City or Village o[f] Crestwood.

> \*     \*     \*     \*     \*     \*

---

afternoon was an accommodation to draw a larger crowd to the Saturday night festivities.

**7.** An Italian-speaking priest celebrated the service in order that it might truly convey the traditional Italian flavor of the event. Thus,

Crestwood had a legitimate interest in obtaining the services of one who could communicate in the language of the Italians.

**8.** I note that most writers create their own headlines for their articles.

THE COURT: "So you are saying there is no incremental cost?

[VILLAGE ATTORNEY]: "That's right."

Nonetheless, the district judge, straining to support his TRO, concluded that "it is really not possible to reconcile that position [Women's Club sponsorship instead of Village sponsorship] with Village's own characterizations in its own publication...."[9] TRO at 6, n. 4. Thus it is obvious that in the tailoring of his opinion the trial judge has deliberately reached out and magnified the Village's advertisement of the authentic Italian mass in an attempt to justify his TRO. I would hold that the district court's finding of Village sponsorship of the authentic Italian mass was clearly erroneous.

## III. TEMPORARY RESTRAINING ORDER

This case is before us on an Emergency Motion For a Stay Pending Appeal, a motion to suspend the district court's TRO that is now moot as it applies to the 1990 Italian Fest. Under the circumstances of this case, the stay should have been granted because the plaintiff failed to carry the burden of establishing the requisite factors we articulated in *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984). Those factors are (1) "irreparable harm if the injunction is denied"; (2) "no adequate remedy at law"; (3) the plaintiff's harm without an injunction would be greater than defendant's harm with it; (4) the "plaintiff has a reasonable likelihood of success on the merits"; and (5) "the injunction will not harm the public interest." *Id.* at 382–83. I would hold that the plaintiff failed to sustain his burden of proof on each of these factors, as he had no ascertainable harm to remedy at equity or law, the injunction harmed the residents of Crestwood as well as the public interest, and the plaintiff has no likelihood of achieving his ultimate goal of preventing future religious celebrations regardless of who sponsors them.

**9.** Thus, while the majority contemplates the district court receiving further evidence regarding sponsorship of the mass, it seems like an exer-

### A. Irreparable Harm and No Adequate Remedy at Law

The trial court relied upon *American Civil Liberties Union v. City of St. Charles*, 794 F.2d 265 (7th Cir.1986), for finding that the plaintiff would have suffered an irreparable harm absent the TRO. The plaintiff's complaint alleged that "[h]e will avoid use of Caesar Park while the mass is being conducted there. By the Village's sponsorship of this mass, plaintiff has been injured in that his right to be free from a government body's establishment and endorsement of religion has been violated." The district judge found the complaint sufficient and even failed to require the plaintiff to allege that there was some activity in which he would participate if the mass were enjoined. Indeed, since the service was to take place before the major events of the evening, it is highly questionable whether there was any activity of which the plaintiff would have been deprived at that particular time even if he had avoided the park because of the mass. Thus the plaintiff's purported injury is even less than that alleged in *City of St. Charles*. There the plaintiff alleged that she had to drive out of her way every day of the Christmas season in order to avoid looking at a lighted cross. Such an injury is quite esoteric, but the one alleged here is even more so. The plaintiff is suing because there is a short 45–minute event in a three-day festival, in which he did not wish to participate.

Only in Establishment Clause litigation before a presiding judge with a sympathetic ear could such a nebulous injury confer standing. All other areas of law require a far more concrete injury even to get into court, not to mention the level of injury required for a TRO. That such a complaint could be taken seriously by a court demonstrates the wisdom of Justice Kennedy's *Allegheny* dissent in which he described prior Supreme Court cases as providing

cise in futility, as this district judge has already prejudged the outcome of the additional evidence.

"two limiting principles: Government may not coerce anyone to support or participate in any religion or its exercise; and it may not, in the guise of avoiding hostility or callous indifference, give direct benefits to religion in such a degree that it in fact 'establishes a state religion or religious faith, or tends to do so.'" 109 S.Ct. at 3136 (quoting *Lynch v. Donnelly*, 465 U.S. at 678, 104 S.Ct. at 1361). Applying this formulation to plaintiff's complaint, it is clear that no injury could be found in his allegation that "[h]e will avoid use of Caesar Park while the mass is being conducted there."

The plaintiff has failed to demonstrate irreparable harm. His alleged harm is at most *de minimis*, and it is largely, if not entirely, contrived and imaginary. Rather than using the First Amendment as a shield to protect himself against a potential injury from the government, the plaintiff is attempting to use the First Amendment as a sword to coerce thousands of Crestwood's residents to conform to his own beliefs [10]—he appears to argue that any public acknowledgement of religion is an unacceptable evil because the object of this suit is to enjoin the holding of an authentic Italian mass at the Italian festival, not to prevent the Village from sponsoring the mass. While the district court's TRO focused on the Village advertisement of the mass, it is clear from the complaint that merely eliminating the advertisement would fail to satisfy the plaintiff. It is the religious practice that offends him.

The majority asserts that "[b]ut for the mass, the tent [where the mass was scheduled to be held] would be used as a beer garden between the opening (3:00 p.m. Saturday) and the first concert of the evening, so Doe suffers the same kind of injury as the plaintiff in *ACLU v. City of St. Charles*, 794 F.2d 265, 267–69 (7th Cir. 1986), and has standing." Majority at 1478.[11] This assertion overlooks the possibility, which the majority recognizes in its conclusion, that a mass at the festival would not convey Village endorsement of religion if there were no Village sponsorship. It would be disingenuous to suggest that the plaintiff would avoid Caesar Park during the mass if it were sponsored by the government, but attend the festival during the mass if it were sponsored by private parties.[12] If a mass may be held at a festival that provides an open forum, the only possible harm that could come to the plaintiff from an authentic Italian mass would be government sponsorship of the mass. Thus, even if there were some minute harm to the plaintiff from the Village's advertisement of the authentic Italian mass, the harm was complete when the *Crestwood Adviser* was distributed. There was no cognizable irreparable harm to enjoin because any further harm would be from private parties exercising their own religious liberty and freedom of speech. As Justice O'Connor recently noted in her plurality opinion in *Mergens*, "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Mergens*, 110 S.Ct. at 2372 (emphasis in original). The government "speech" in advertising the authentic Italian mass failed to constitute an endorsement of the mass; thus there was no Establishment Clause violation. Conversely, the injunction restraining the mass prevented the exercise

---

**10.** As in *Mather v. Village of Mundelein*, 864 F.2d at 1297 (Coffey, J., concurring), the plaintiff "is not interested in the expression of recognition of [his] own religious viewpoint, but rather in the suppression of recognition of another religious viewpoint." In *Mather* we appropriately refused to allow the plaintiff to use this court to suppress the religious views of others, and we should have done so here.

**11.** The plaintiff nowhere alleges that the tent where the mass was scheduled was the only

"beer garden" available at the festival or that the plaintiff would have been present at the "beer garden" if the mass did not occur.

**12.** I mention this potential difference not to minimize the distinction between an injury inflicted by the government and an injury inflicted by a private party, but to emphasize the amorphous nature of the plaintiff's alleged injury. The plaintiff would be drummed out of court in short order if he alleged such an innocuous injury against a private party.

of "private speech endorsing religion," thus the injunction violated the Free Speech and Free Exercise Clauses.

The esoteric nature of the plaintiff's alleged harm highlights the convoluted state of Establishment Clause jurisprudence at this time. It is unsurprising, however, that an Establishment Clause doctrine that recognizes a harm in the absence of government coercion, interference with or suppression of religion results in a jurisprudence incapable of objective analysis. Giving judicial cognizance to amorphous harms like the one alleged in the instant complaint stands the First Amendment on its head. As Justice Kennedy noted in his *Allegheny* dissent,

> "The freedom to worship as one pleases without government interference or oppression is the great object of both the Establishment and Free Exercise Clauses. Barring all attempts to aid religion through government coercion goes far toward attainment of this object."

*County of Allegheny*, 109 S.Ct. at 3136. Even "[w]hen the government speaks but does not compel others to worship or penalize those with different views, there is no serious threat to religious freedoms." *Mather v. Village of Mundelein*, 864 F.2d at 1298 (Easterbrook, J., concurring). I believe it is time for the judiciary to rethink our First Amendment jurisprudence and return to requiring harms capable of concrete definition and objective analysis before claims are recognized, as we do in every other area of law. In this way we would protect religious liberty as was the original intent of the framers of the constitution. Instead, the trial judge found, and now the majority accepts, a supposed harm in a quagmire of quicksand as they trip through an evidentiary vacuum of speculation to create a specious legal argument. Taking cognizance of such a spurious harm is a giant step toward building an absolute wall between church and state, an edifice that has never before existed in the United States.

> "No significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all the other parts, much less from

government. 'It has never been thought either possible or desirable to enforce a regime of total separation.' ... Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any.... Anything less would require the 'callous indifference' we have said was never intended by the Establishment Clause.... Indeed, we have observed, such hostility would bring us into 'war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion.'"

*Lynch v. Donnelly*, 465 U.S. at 673, 104 S.Ct. at 1359. Characterizing the plaintiff's complaint as a harm demonstrates at least "callous indifference" to the religious liberty of the Crestwood Women's Club who desired to sponsor the mass; acknowledging it as an "irreparable harm" adequate to merit a TRO demonstrates outright hostility to the Italians' national religion.

Doe alleges he would be left with no adequate remedy at law for his "irreparable harm" if the TRO were denied because " 'an erosion of religious liberties' cannot be rectified by awarding money damages at a later date." The plaintiff's motion for TRO at 9 (quoting *ACLU v. City of St. Charles*, 794 F.2d 265, 275 (7th Cir.1986)). Since the plaintiff has no realistic harm and no erosion of his religious liberties (he was neither forced nor coerced to attend the mass), of course there is no remedy at law. The presence of an authentic Italian mass in the context of Italian culture cannot be "an erosion of [the plaintiff's] religious liberties." Indeed, as I mentioned above, the plaintiff is in effect, through the Courts, suppressing the religious liberties of others rather than exercising his own. Such suppression is as inappropriate here as it would have been in *Mather v. Village of Mundelein*, 864 F.2d 1291 (7th Cir.1989) where the plaintiff was attempting to suppress the display of religious symbols in a Christmas display:

"Although respect for freedom of religious conscience and religious tolerance certainly require that religious believers refrain from using governmental means to injure non-believers and believers of other religious creeds, in light of government's historical recognition of the religious beliefs of its citizenry, these values must also be understood to require that a non-believer or a believer of another religious creed not use the courts to exclude the symbols a religious believer holds dear from a holiday display."

*Id.* at 1296 (Coffey, J., concurring). In the future, we should follow the constitutional mandate and refuse to allow those who hold traditional religious beliefs and practices in contempt to use our Court as a vehicle for the suppression of religious practices.

### B. Balance of Harms

The plaintiff contends that his putative injury outweighs that of the Village because the Village has no legal harm. If the Village is viewed as an entity apart from its people, that is true, and the balance of harms would always go against the Village in any TRO motion. But that would be equivalent to viewing a corporation as an entity distinct from the shareholders. Such a perspective is not viable in corporate law, and we should not view the Village as separate from its residents here. A village is an entity of the government that is the people, not a building with four walls, a foundation and a plot of grass. When the alleged harm to the plaintiff is weighed against the harm to the residents of Crestwood, the scales swing in favor of the Village and its people for a number of reasons. First, the injunction prohibits an accurate portrayal of Italian culture. The role of Roman Catholicism in Italian life and culture cannot be gainsaid, and a portrayal of the culture without the religious aspect is inaccurate. Second, the authentic Italian mass was a method of attracting patrons to the festival because attending that mass would fulfill the patrons' weekly obligation to attend a weekend mass. While the mass itself was free, the additional people attracted by the mass would contribute to the income of the festival merchants and, I assume, would inure to the benefit of the Village coffers. Third, canceling the mass at the last minute endangered creating political divisiveness because many Roman Catholics would have attended the festival to fulfill their weekly obligation of attending mass, and they would have been inconvenienced and probably frustrated by the cancelation. Finally, an injunction against a presentation of an ethnic group's traditional religious observance in a portrayal of that group's culture sends a clear message that the courts disapprove of the public practice of religion under the ever-expanding umbrella of the Establishment Clause. The Italian residents of Crestwood cannot help but feel that the Courts are hostile to their beliefs in prohibiting their free exercise of their religion when their authentic Italian mass is enjoined.[13] Thus, the TRO clearly inflicts a greater harm on the Village residents who would have benefited from the mass than the mass would have imposed on the plaintiff.

### C. Reasonable Likelihood of Success

The plaintiff has failed to demonstrate "a reasonable likelihood of success on the

---

**13.** The prohibition of the authentic Italian mass clearly demonstrates the same kind of government hostility to religion that would have been demonstrated by preventing the inclusion of a crèche in the Christmas display at issue in *Mather:*

"Court ordered exclusion of a religious symbol from a display or the prevention of erection of any display if it incorporates religious themes leaves adherents of any and all religions respecting the deity with the same feeling that government is hostile to their religious beliefs as the non-adherent may feel if

the alleged religious symbol is included. The constitutional values of respect for freedom of religious conscience and of religious tolerance, which Justice Stevens recognized in [*Wallace v.*] *Jaffree*[, 472 U.S. 38, 52–54, 105 S.Ct. 2479, 2487–88, 86 L.Ed.2d 29 (1985)], understood in their true senses, mean that we must demonstrate consideration for others' beliefs and feelings in religious matters even when they are not the same as ours."

*Mather v. Village of Mundelein*, 864 F.2d at 1296–97 (Coffey, J., concurring).

merits" of his request for a permanent injunction against further masses at festivals portraying ethnic cultures. As recited above, the authentic Italian mass scheduled during the "Touch of Italy" festival passes the *Lemon* test. Thus, at most the plaintiff has shown a possibility of succeeding in preventing government advertisement of such ethnic portrayals of religious beliefs in the future, but even that limited possibility of success may fail after a full hearing. I am convinced that a fully developed record will demonstrate that the Village's assertion that there was no government sponsorship of the authentic Italian mass was accurate and valid. If so, the "valet service" (4:30 p.m. Friday afternoon hearing) from the district judge in granting the plaintiff's TRO motion on an inadequate record at the eleventh hour deprives the defendants of their constitutional rights to free speech and free exercise of religion. Because the injunction against the mass harmed the defendants and the mass itself would not harm the plaintiff, the plaintiff is without a "reasonable likelihood of success on the merits" of his claim.

### D. Harm to the Public Interest

Under the *Roland Machinery* "public interest" factor, it is the interest of persons other than the parties to the suit that must be considered and protected. In the instant case, it is clearly in the public interest to provide an accurate picture of Italian culture when celebrating that culture in a classic Italian festival entitled a "Touch of Italy." Absent the inclusion of the religious aspect of Italian culture, non-Italians attending the festival would get a false concept of what traditional Italian family life and culture is, and Italian–American children whose parents no longer follow the traditional Italian religion will receive a skewered picture of their heritage. Furthermore, prohibiting the expression of so integral a part of Italian culture as their traditional religious practice demonstrates a clear government hostility not only toward the traditional Italian religion but also toward public displays of any religious beliefs. Our nation was built on the principle of "one nation under God with liberty and justice for all," including liberty and justice for those who adhere to a belief in a Supreme Being as well as those who have no beliefs. Thus while the government may not show favoritism to religion, neither may it show hostility: "What is crucial is that a government practice not have the effect of communicating a message of government endorsement or *disapproval* of religion." *Lynch v. Donnelly,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring) (emphasis added). The district court's speedy granting of the TRO on an insufficient record harmed the public interest by suppressing the expression of the traditional Italian religious practice and by demonstrating government hostility toward public displays of religious beliefs. The granting of the TRO should have been stayed.[14]

---

**14.** I note one further issue that should have militated against upholding the district court's TRO, the issue of timing. The plaintiff filed his motion for a TRO along with his complaint on August 10, 1990, the day before the mass was scheduled. At the hearing, the plaintiff's attorney alleged that the timing was unavoidable because (1) Doe first contacted his attorney Tuesday, August 7, (2) Doe's attorney contacted the Village attorney Wednesday, August 8, (3) at 9:30 p.m. on August 9, the Village attorney notified Doe's attorney that the Village planned to retain the mass as part of the program, and (4) Doe filed suit the next morning. This sequence of events resulted in a hearing at 4:45 p.m. Friday afternoon, August 10, with a TRO being issued at 5:30 p.m. followed by an immediate emergency appeal, which necessitated our deciding the appeal on Saturday, August 11. Given the fact that ethnic festivals in the Village have included masses in the traditional language of the celebrated culture for six years, the last-minute timing of this suit may well have been deliberately orchestrated in order to prevent full consideration of the issues involved. Upholding the instant TRO encourages such orchestration. I believe it would be in the best interests of proper court management and the preservation of precious judicial time to give all parties sufficient opportunity to present a well-researched and well-prepared argument and thus give the court sufficient opportunity to make a well-reasoned judgment. I would favor rejecting last-minute motions for a TRO or preliminary injunction unless unique circumstances make such a last-minute motion necessary—especially when as here the question of irreparable harm does not exist. *Cf. Nassau Boulevard Shell Service Station, Inc. v. Shell Oil Co.,* 869 F.2d 23, 24 (2d Cir.1989) ("We believe

## IV. CONCLUSION

This case is dealing with the government's suppression of religion rather than the government establishment of religion. The plaintiff is concerned only with attempting to suppress the religious practices of others, not the government's suppression of his own religious liberty. The Establishment Clause of the First Amendment was never intended to be used as a sword to suppress and stifle the religious practices or beliefs of American citizens. Rather, it was intended as a protection *against* the government suppression of the free exercise of religious beliefs. The plaintiff has turned the Establishment Clause shield, which was designed to protect his religious beliefs, into a lethal instrument used merely for the purpose of attacking other religious beliefs. In his TRO, the district judge recognized the importance of Doe's religious liberties. But he assumed, somehow, that the presentation of an authentic Italian mass in the context of the presentation of Italian culture at the "Touch of Italy" festival would impair those religious liberties. The district judge's assumption is based on a faulty syllogism. The syllogism goes something like this: (a) The plaintiff has a constitutional right to religious liberty; (b) the government may not impair the plaintiff's religious liberty; (c) exposing the plaintiff to the religious practices and beliefs in the presentation of an authentic Italian mass at a government-sponsored Italian festival impairs the plaintiff's religious liberty. Absent government taxation to support the Italian mass or government coercion to force someone to participate at the mass, or government prevention of the plaintiff's expression of his own religious beliefs, the last proposition is faulty. It is impossible to impair one's religious belief without somehow preventing him from expressing it. The district judge, now with the majority's approval, has inexplicably confused freedom *of* religion for freedom *from* religion. Our nation should encourage its citizens to express their religious beliefs or lack thereof, within constitutional limits whether it be through Judaism, Christianity or any other belief that emphasizes the importance of moral values. What better vehicle do we have to strengthen the eroding moral fibre of this nation, which has been sapped of its very vitality by the increased emphasis in public education and all facets of life on materialism, relativism and on unhealthy secularism? We should strive for a re-birth of morality and human responsibility (with every right there is a corresponding obligation) in a concerted effort through public education, the pulpit, the bema, the news media, radio and television programs. What better course can we follow to effectively address the escalating national cancers of child abuse (2 million cases a year), drug abuse (4 million heavy drug users [15]), teen pregnancies (1 million per year), unwed mothers (¼ of all births), divorce (1 out of 2 marriages) and murder (one every 24 minutes)? *No great nation has ever maintained its position as a world power without a strong moral foundation. See* 1 A. Toynbee, *A Study of History* (abr. ed. 1947). Let us not contrive ways to make it difficult for people to practice the religion of their choice.

that in the future such eleventh hour motions for preliminary relief should ordinarily be denied in this court and in district courts."). The instant case is not a true emergency such as arises when there is a need for immediate surgery to save a life, but the insurance agency has refused to cover it because the procedure is considered experimental, or a crucial blood transfusion for an infant child is rejected by a parent or guardian on religious grounds. I do not consider waiting until the eleventh hour to contact an attorney adequate justification for last-minute temporary relief. The plaintiff alleges that he has resided in the Village of Crestwood for nearly 17 years. Thus, the ethnic mass did not first come to his attention on August 7, 1990, and as in *Nassau*, the plaintiff "could have moved for relief months before it did and given the district court and us an opportunity to resolve the outstanding legal issues well before the [festival] date." *Id.* at 24. I have grave doubt that the plaintiff's timing and need for a TRO was not contrived and orchestrated, and thus the motion should have been denied.

**15.** Estimate of William Bennett, Director of the federal anti-drug program.

The granting of the TRO should have been stayed, and the plaintiff's complaint should have been dismissed for failure to state a claim upon which relief can be granted. I dissent.