In the
United States Court of Appeals
For the Seventh Circuit

No. 01-3002

Dan Linnemeir, et al.,

Plaintiffs-Appellants,

v.

Board of Trustees of Purdue University,
et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:01CV0266--William C. Lee, Chief Judge.

Submitted July 27, 2001--Decided August 7, 2001


   Before Bauer, Posner, and Coffey, Circuit
Judges.

   Posner, Circuit Judge.   Three residents
of Indiana move under Fed. R. App. P. 8
for a stay pending their appeal from the
district court's refusal to grant a
preliminary injunction that would forbid
the Fort Wayne campus of Indiana
University-Purdue University, a state
institution, to put on a performance of
Terrence McNally's notorious play Corpus
Christi. The play, scheduled to begin its
run on August 10, depicts Jesus Christ as
a homosexual who has sexual relations
with his disciples, and the movants argue
that by presenting the play the
university will be violating the First
Amendment by publicly endorsing anti-
Christian beliefs. The play is indeed
blasphemous, although that apparently was
not the intention of McNally (who is
himself homosexual), according to his
preface to the published version.
Whatever his intentions, most believing
Christians will be shocked and offended
to hear one of Christ's disciples yell to
Christ on the cross, "Hey, faggot! If I
was the son of God I wouldn't be hanging
here with my dick between my legs. Save
us all if you're really Him." That is not
an untypical passage.

   The play is to be presented at a theater
on campus that is open to any group that

wants to use it, so long as the use would comport with the university's educational mission. The performance of Corpus Christi would so comport, because the play is being put on by a theater major as part of his course requirements. For obvious reasons, the university has been at pains to disclaim any endorsement of the theme of the play; the playbill states: "The selection and performance of the play do not constitute an endorsement by [the university] of the viewpoints conveyed by the play."

The contention that the First Amendment forbids a state university to provide a venue for the expression of views antagonistic to conventional Christian beliefs is absurd. It would imply that teachers in state universities could not teach important works by Voltaire, Hobbes, Hume, Darwin, Mill, Marx, Nietzsche, Freud, Yeats, Heidegger, Sartre, Camus, John Dewey, and countless other staples of Western culture. It is true that a public university that had a policy of promoting atheism, or Satanism, or secular humanism, or for that matter Unitarianism or Buddhism, would be violating the religion clauses of the First Amendment. County of Allegheny v. ACLU, 492 U.S. 573, 610-11 (1989); School District of Abington Township v. Schempp, 374 U.S. 203, 225 (1963); Torcaso v. Watkins, 367 U.S. 488, 495 n. 11 (1961); Brooks v. City of Oak Ridge, 222 F.3d 259, 266 (6th Cir. 2000); Church on the Rock v. City of Albuquerque, 84 F.3d 1273, 1279 (10th Cir. 1996); Edwards v. Aguillard, 482 U.S. 578, 635 n. 6 (1981) (dissenting opinion). But that is not charged; and so the controlling principle is that the amendment "forbids alike the preference of a religious doctrine or the prohi-bition of theory which is deemed antagonistic to a partic-ular dogma . . . . '[T]he state has no legitimate interest in protecting any or all religions from views distasteful to them.'" Epperson v. Arkansas, 393 U.S. 97, 106-07 (1968), quoting Burstyn, Inc. v. Wilson, 343 U.S. 495, 505 (1952). "It is not the business of government in our nation to suppress real or imagined attacks upon a particular religious doctrine." Id. The student whose project it is to produce Corpus Christi to satisfy the requirements of his major is of course not an employee of the university, let alone a part of its management; he was

not told to put on this offensive play--it was his own idea; and there is no evidence that if the play attacked some other religion, the university authorities would have forbidden it. In short, there is no evidence that the university is hostile to Christianity.

The government's interest in providing a stimulating, well-rounded education would be crippled by attempting to accommodate every parent's hostility to books inconsistent with their religious beliefs. Fleischfresser v. Directors of School District 200, 15 F.3d 680, 690 (7th Cir. 1994); see also McCollum v. Board of Education, 333 U.S. 203, 235 (1948) (Jackson, J., concurring). "If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself." Brown v. Woodland Joint Unified School District, 27 F.3d 1373, 1379 (9th Cir. 1994).

The parties and the district judge have spent a lot of time debating whether the university's theater is really a public forum. Santa Fe Independent School District v. Doe, 530 U.S. 290, 302-04 (2000); Chicago Acorn v. Metropolitan Pier & Exposition Authority, 150 F.3d 695 (7th Cir. 1998). The plaintiffs seem to think that if it is not, the university has no right to allow a blasphemous play to be performed in it. (If it is, that would weaken any inference that by permitting Corpus Christi to be performed the university was endorsing its message. Santa Fe Independent School District v. Doe, supra, 530 U.S. at 302-03.) That is incorrect. Classrooms are not public forums; but the school authorities and the teachers, not the courts, decide whether classroom in-struction shall include works by blasphemers. E.g., Grove v. Mead School District No. 354, 753 F.2d 1528, 1534 (9th Cir. 1985). It is the same with a university theater.

In reciting these well-established propositions we do not mean to deny the pain that a play such as Corpus Christi inflicts on believing Christians (and not only on them) or to suggest that its author ranks with the nonbelieving giants

of our cultural tradition. The fact that the play has been published, and ran in New York, will not immunize it from charges that it is a typical product of the lunatic cultural Left. The conservative cultural historian Gertrude Himmelfarb, in her book One Nation, Two Cultures (1999), brackets Corpus Christi with a sitcom in which Abraham Lincoln and his wife make sexual overtures to the same black man and with "'whiteness studies' (which celebrate 'white trash' and expose the inherent racism in being white)." Id. at 127-28, 132. But the quality or lack thereof of Corpus Christi and other postmodernist provocations is a matter for the state university, not for federal judges, to determine, as would be obvious if a parent were complaining that in a course on the Bible the teacher had used a poor translation. Academic freedom (see Piarowski v. Illinois Community College District 515, 759 F.2d 625, 629-30 (7th Cir. 1985), and cases cited there), and states' rights, alike demand deference to educational judgments that are not invidious; for, to repeat, the university has been scrupulous in publicly disclaiming that by exhibiting Corpus Christi it is allying itself with the enemies of Christianity. We add that Piarowski was a case about a public college's own efforts to control an exhibition of offensive art on its premises; it was not about private citizens' trying to prevent a public college from permitting the exhibition of offensive art, or in this case theater, as part of its curricular program.

The motion for a stay is

Denied.


COFFEY, Circuit Judge, dissenting. In this case, we are faced with a clash in the balancing of the First Amendment of the U.S. Constitution and academia's interpretation of the freedom of speech clause. I am fully cognizant that college campuses play a vital role as a forum for the free exchange of ideas, as well they should.

However, should this court allow the Ft. Wayne campus of Indiana University/Purdue University (IPFW) to stage a performance of Corpus Christi, it states a clear

message that we will, with a wink and a nod, tolerate government-sponsored attacks on religion. Allowing the university to stage the play would open the flood gates for anti-religious speech where any religion (be it Roman Catholicism, Protestantism, Judaism, Islam, Buddhism, etc.) could be the target of the vile and hateful speech that is from this date forward sanctioned by the government.

It is interesting to note that the State of Indiana is one of only six states in the country, which to date has failed to enact hate crime law legislation. Nonetheless, the First Amendment forbids government hostility toward any and all religions, as does the anti-harassment policy in the IPFW Code of Student Conduct. Because this case is of utmost importance to our First Amendment jurisprudence, the denial of the plaintiffs-appellants' motion under F.R.A.P. 8 for a stay pending appeal from the district court's denial to grant a preliminary injunction, forces me to respectfully dissent.

I.  Standard of Review

In reviewing the plaintiffs-appellants' motion for an injunction pending appeal, we apply the same standard we would in reviewing a district court's denial of a preliminary injunction. That is, we review the district court's findings of fact for clear error, its balancing of the factors for a preliminary injunction under the abuse of discretion standard, and its legal conclusions de novo. Kiel v. City of Kenosha, 236 F.3d 814, 815 (7th Cir. 2000). In assessing whether a preliminary injunction is warranted, a court must consider whether the party seeking the injunction has demonstrated that: 1) it has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if it is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest. Id.

II.  The State of the Record

On the state of the scant evidentiary record before us, it is almost impossible to determine the threshold question of whether Studio Theater has fulfilled the test for a public forum as set forth by the Supreme Court. A public forum is "defined by the objective characteristics of the property, such as whether, 'by long tradition or government fiat,' the property has been 'devoted to assembly and debate.'" Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998). "Limited" public fora are places where the government has decided to open up an area or facility to a broad range of expressive conduct. International Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992). The evidence relied upon by the district court for its "limited public forum" holding is that (1) "two university administrators testified that any group who desires to utilize Studio Theater would be permitted to do so on a viewpoint neutral basis so long as the group's activities comport with the educational mission of the university," and (2) only one outside group in the last thirty years, a high school drama club, has been granted permission to use the theater to stage a production. However, the two university administrators (IPFW Chancellor Michael Wartell and Theater Department Chair and Artistic Director Larry Life) produced no evidence of any such "open" policy other than their own self-serving testimony. Without any evidentiary support, their self-serving testimony is hollow.

In my view, the record is devoid of any evidence regarding the use of Studio Theater by non-university organizations to stage their own productions, with the singular exception of one outside group in the last thirty years. If, as Director Life and Chancellor Wartell maintain, the school has a policy of allowing open access to the theater to other student groups and non-IPFW groups, then why hasn't a single document, whether a handbook, written policy, official proclamation, statement on non-discriminatory openness of the forum or the like, been supplied for the record? This policy, if there is one, may very well be secreted in the theater building's cornerstone, because there is no evidence of it in this record. There is no evidence in this record that IPFW

student groups, other than theater students, have taken advantage of this policy. Has the school made the public at-large aware of its policy allowing Studio Theater to be used? Have there been previous denials of student or non-IPFW groups' applications to use the theater? What are the criteria that the Theater Department's five-member faculty screening committee uses to determine whether or not to approve a student performance? Is there any written evidence of the screening committee's previous decisions to allow (or deny) student use, or the use by non-university groups, of the theater? These questions and a myriad of others remain unanswered in the limited record.

The evidentiary record before us is so sparse and leaves so many questions unanswered, that the most prudent course of action would be to grant the plaintiffs-appellants' motion for a stay in order that the record can be supplemented and clarified. This would allow us to make a more informed judgment and assist us in deciding if IPFW's practice has in fact created a "limited public forum." After all, the play can be rescheduled, but the damage to the First Amendment caused by its production could never be undone.


III. Government Speech v. Private Speech--Is Studio Theater a Limited Public Forum?

Even were we to accept the record developed in the tri-al court as being sufficiently complete to make a well-reasoned and informed decision, I would nonetheless be forced to dissent because I am convinced that the district court's finding that Studio Theater is a "limited public forum" is not supported in the evidence presented.

The district court correctly noted that the threshold question facing the court was who is the "speaker" in this case-- the government or a private individual? It is axiomatic that government speech that endorses religion, or evidences hostility toward a particular religion, is constitutionally improper under the Establishment Clause, but that private religious speech is protected by the Free Exercise Clause. Board of Educ. of the

Westside Cmty. Sch. v. Mergens, 496 U.S. 226, 250 (1990). It is also true that private religious speech enunciated on government property is not automatically attributed to the government. See Good News Club v. Milford Cent. Sch., ___ U.S. ___, 121 S.Ct. 2093, 2103 (2001). Whether speech that occurs on government property can be attributed to the government turns on whether the forum is truly open to the public and the degree to which the speech is "sponsored" by the governmental entity. See Widmar v. Vincent, 454 U.S. 263, 276 (1981); Good News Club, 121 S.Ct. at 2103; Doe v. Village of Crestwood, Illinois, 917 F.2d 1476, 1478–79 (7th Cir. 1990). In this case, the trial judge held that Studio Theater in Kettler Hall is "at the very least a limited public forum." Further, the trial judge concluded that the university did not implicate the Establishment Clause by staging a performance of Corpus Christi because the university maintained viewpoint neutrality when selecting plays to be performed in Studio Theater. However, the premise supporting the trial judge's conclusion (that Studio Theater is a "limited public forum") lacks evidentiary support in the (limited) record.

As mentioned previously, the evidence relied upon by the district court for its "limited public forum" holding is that (1) Chancellor Wartell and Director Life testified that any group desiring to use Studio Theater would be permitted to do so on a viewpoint neutral basis so long as the group's activities comport with the (expansive and undefined) "educational mission of the university," and (2) just one outside group in the past 30 years, a high school drama club, has used the theater to stage a production. However, the two university administrators failed to produce any evidence of such an "open" policy other than their own self-serving statements in court. No written university policy (handbooks, etc.) regarding open public use was introduced in evidence or cited by the witnesses. There was no testimony to the effect that the university had at any time or in any way publicized the alleged "openness" of Studio Theater to the public or invited any private group to use the theater. Most importantly, Director Life was able to delineate only one instance in three decades in which

any non-university group had used the theater, and he identified all other uses of the theater as being productions staged by the Theater Department at IPFW. The absence of documented historical evidence, either oral or written, in support of the district court's finding that Studio Theater is a limited public forum stands out like a beacon in the night.

I do not agree with the trial court's finding that Studio Theater is a "limited public forum" because it is only "open" to students who are required to stage productions as part of the Theater Department's curriculum. The use of a university theater exclusively by its own students (one exception) as part of their credited course work is no more a public forum than is an ordinary university classroom in which students are required to present oral reports under the direction of the professor. There is no evidence in this record that the theater is open to the general student body. Rather, testimony demonstrated that only 40-50 students are registered in the Theater Department, only three of which are classified as having an emphasis in directing. Thus only three students out of the entire IPFW student body will be staging productions in Studio Theater this year. Moreover, Director Life testified that in the past thirty years, only 20-25 student-directed plays have been staged in the theater. This extremely limited use of Studio Theater by IPFW's own theater students falls short of lending credence to the finding of a limited public forum.

Looking at Seventh Circuit case law, I note that in Piarowski v. Illinois Cmty. Coll. Dist. 515, 759 F.2d 625 (7th Cir. 1985), we addressed the "public forum" issue in the context of a college art teacher who had been ordered by the administration to relocate several of his art works from a gallery on college grounds to another part of the school be cause the art in question contained sexually explicit representations (an exercise in good judgment on the part of the administration, unlike this case). The teacher brought suit on First Amendment grounds, arguing, in part, that the gallery was a public forum because artists from outside the college had occasionally exhibited works there. We

rejected this contention:

That [the teacher] sometimes invited artists from outside the college to exhibit their work in the gallery no more made the gallery a public forum than a teacher's inviting a guest lecturer to his classroom would make the classroom a public forum . . . . Occasional use by outsiders, which is all that this record shows, is not enough to make a college art gallery a public forum.

Piarowski, 759 F.2d at 629 (emphasis added).

It is self-evident that the one single use of Studio Theater at IPFW by "outsiders" in the last 30 years, as disclosed in the record, does not even rise to the level of the "occasional use" that was found to be inadequate to create a public forum in Piarowski. The facts of this case are a far cry from the court's determination of a public forum in Widmar, where the university made its facilities generally available to over 100 autonomous student groups. Widmar, 454 U.S. at 265. Based on the record presented in this case and the Seventh Circuit case law, I am forced to disagree with the district court's conclusion that Studio Theater is a limited public forum.

My conclusion that in this case it is the government, and not a private individual, that is doing the "speaking" is strengthened by our holding in Doe v. Village of Crestwood, Illinois, 917 F.2d 1476 (7th Cir. 1990). In that case, we held that a municipality was sponsoring a Catholic Mass at an Italian festival held in a municipal park, and that the municipality's "sponsorship" of the mass conveyed a message of governmental "approval or endorsement" of Christianity. Id. at 1479. The question of municipal sponsorship was established in the facts that (1) a municipal employee had invited and recruited the priest to say the mass; (2) an article in a newspaper published by the municipality bore the headlines "Italian Mass to be Celebrated at our Italian Fest" and an advertisement stated "Join Us for a Traditional Italian Mass Celebration"; and (3) no evidence was produced to support the contention that a private group was the true sponsor of the mass or that the municipality was simply

providing a public forum equally open to other private groups. Id. at 1479. Our finding of municipal sponsorship was not affected by the additional fact that there was no evidence that the municipality was planning to spend a single cent on the mass. Id. at 1478.

The facts presented herein demonstrate governmental sponsorship in a far more compelling manner than those set forth in Crestwood: (1) John Gilbert, a theater student, is intent on producing Corpus Christi. He is required to direct a play under the supervision of the school in order that he might fulfill his degree requirements; (2) the selection of Corpus Christi was approved by a five-member panel composed of faculty from the university's theater department, and the Chancellor of the university retains the authority to overrule the panel's approval; (3) the play has been advertised in a brochure paid for by the university and mailed by the university to subscribers; (4) Director Life will be attending all rehearsals of the play and advising Gilbert regarding his artistic approach to the production and his work with the actors; (5) Director Life has been interviewed and quoted several times in the local media regarding the play; (6) Chancellor Wartell has written a local newspaper article defending production of the play and has promoted public interest in it through his declaration of intention to attend the play; and (7) the play will be performed in a campus theater in which the utilities and security are underwritten by the university. In short, the facts contained in this record are more probative of university sponsorship than were the limited facts of municipal sponsorship of the Catholic Mass in Crestwood.

I conclude that Studio Theater cannot be properly classified as a public forum or limited public forum. The "speaker" in this case is therefore the university, and this issue must be analyzed under the test established in Lemon v. Kurtzman, 403 U.S. 602 (1971), for a determination of whether the university's "speech" constitutes an impermissible endorsement or disapproval of religion.

IV.  Establishment Clause Analysis

The first prong of the Lemon test focuses on the purpose of the governmental conduct at issue./1 "The purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion." Edwards v. Aguillard, 482 U.S. 578, 585 (1987) (emphasis added) (quoting Lynch v. Donnelly, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)). Both endorsement and disapproval are prohibited in light of the preeminent goal of the First Amendment to promote government "neutrality" toward religion. See Grand Rapids Sch. Dist. v. Ball, 473 U.S. 373, 382 (1985).

The Supreme Court has consistently described the Establishment Clause as forbidding not only state action motivated by a desire to advance religion, but also action intended to "disapprove," "inhibit," or evince "hostility" toward religion. See Edwards, 482 U.S. at 585 ("disapprove"); Lynch, 465 U.S. at 673 ("hostility"); Committee for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 788 (1973) ("inhibi[t]"). Prohibited government action includes that which "foster[s] a pervasive bias or hostility to religion, which could undermine the very neutrality the Establishment Clause requires." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 845-46 (1995) (emphasis added); see also Mergens, 496 U.S. at 248 (plurality opinion) (government action must demonstrate neutrality toward religion, not "hostility toward religion."). As stated by the Supreme Court:
[The Constitution] affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any . . . . Indeed, as we have observed, such hostility would bring us into 'war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion.'

Lynch, 465 U.S. at 673 (citations omitted, emphasis added).

Governmental endorsement of a particular religious faith is prohibited, and it is banned because the endorsement of one faith acts as a tacit disapproval of other faiths. Thus, an overt, state-

sponsored demeaning of the tenets of one faith cannot pass constitutional muster any more than the implied condemnation resulting from the endorsement of another. As Justice O'Connor stated:

Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message.

Lynch, 465 U.S. at 688 (O'Connor, J., concurring) (emphasis added).

A state-sponsored disparagement of a particular belief sends the message to its believers that they and their firmly held convictions are disfavored members of the community. The First Amendment mandates government neutrality toward religion and bars hostility aimed at any particular faith. I believe that the University's sponsorship of Corpus Christi runs afoul of this fundamental principle./2 In my view the play is nothing other than a vulgar, undisguised mockery and disparagement of the Roman Catholic Christian faith.

It is interesting to note that the majority did not rely on the district court's limited public forum reasoning and instead decided the case under the all-inclusive theory of "academic freedom." The majority's view displays disfavor for anyone who would attempt to set limits upon the question of speech that may occur on campus. This includes telling the university representatives that they are bound by the Constitution and have no right to participate in the disparagement of any religious faith./3 While I certainly respect, and always will, the concept of academic freedom and believe that college campuses "play a vital role" as a forum for the free exchange of ideas, I also wish to make it clear that this freedom has limits and universities must respect the religious rights of all protected in the First Amendment:

While we have spoken in terms of a wide protection for the academic freedom and autonomy that bars legis-latures (and courts) from imposing conditions on the spectrum of subjects taught and

viewpoints expressed in college teaching, we have never held that universities lie entirely beyond the reach of students' First Amendment rights.

Board of Regents of Univ. of Wisconsin Sys. v. Southworth, 529 U.S. 217, 238 (Souter, J., concurring); see also Dow Chem. Co. v. Allen, 672 F.2d 1262, 1275 (7th Cir. 1982) ("Of course academic freedom, like other constitutional rights, is not absolute, and must on occasion be balanced against important competing interests.") (emphasis added).

The majority, in an attempt to justify its academic freedom analysis, compares the performance of Corpus Christi to teaching the works of Darwin, Marx, Freud, and other "nonbelieving giants in our cultural tradition." To me this comparison is inaccurate and misleading. The works of Darwin and Marx might be considered, in a limited way, to be incompatible with Christian beliefs, but the premise of Corpus Christi is entirely different--it is an outright disparagement and mockery of fundamental Christian beliefs, and can only be characterized as a vulgar attack on Christianity and those who choose to accept and believe its teachings. The majority and I agree that the vilification of Christianity exemplified by Corpus Christi is not legitimized by the fact that the play has been published and performed, or that it might even be regarded by some as having artistic merit. The portrayal of Jesus Christ as a sexually active homosexual who engages in sexual acts with his disciples amidst a torrent of profane and vulgar language is nothing short of the overt defamation of a particular religious faith, and the university's sponsorship and endorsement of this attack impermissibly evinces a hostility toward Christianity prohibited by the Establishment Clause. One can opine that those responsible for the portrayal of historical facts in this manner may be prey to highly prejudicial thinking. Their actions more likely than not are intended to undermine and even shatter the moral beliefs shared by a large number of this world's citizens and this behavior can be considered unethical. The university's written declaration of noendorsement contained in the play's program reminds one of a biblical figure who attempted to wash his

hands of any responsibility for his actions.

Closing our eyes to the blatant state-sponsored hostility to Christianity portrayed in Corpus Christi would legitimize and might very well lead to and possibly incite other forms of "hate speech" directed at ethnic minorities, other religious groups, women, and even those in the gay community. Christianity is no less deserving of protection from state-endorsed attack than are any of these groups, and the decision today, in my view, fails our constitutional duty to protect all segments of our cherished, diverse society from religious hostility.

V.  Viewpoint Discrimination

Even were I to agree with the district court that IPFW has created a "limited public forum" at Studio Theater, I would still be forced to dissent. Once the government has opened a limited forum, it must "respect the lawful boundaries it has itself set. [It] may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' nor may it discriminate against speech on the basis of its viewpoint." Rosenberger, 515 U.S. at 828 (internal citations omitted). I refuse to rush to the conclusion reached by the district court and the majority that the university has not engaged in viewpoint discrimination in their procedure of selecting the plays that are to be performed in Studio Theater.

The only evidence in the record to suggest that the school has not engaged in any viewpoint discrimination is the self-serving declaration of IPFW Theater Department's Chair and Artistic Director Larry Life that he has not engaged in viewpoint discrimination and IPFW Chancellor Wartell's testimony that if a play is "brought up through the theater department in standard form" that he would not stop it unless its content were illegal. But Director Life has demonstrated his support for the very heart and soul of this particular play, and has "donated" his time to attend each and every rehearsal, while Chancellor Wartell, the senior administrator at IPFW, has stated publically that he will attend the play.

On the other hand, the record is devoid of any evidence to establish that other theater groups have been allowed to use Studio Theater to stage their own productions. Isn't it strange that there is only one instance in thirty years where a non-university group used the theater. This is a far cry from the customary usage standard usually referred to when determining the existence of a public forum. As previously discussed, Life and Wartell maintain that the school has a "policy" that allows other student groups and non-university related groups access to the theater. Again, it is all well and good for Wartell and Life to baldly assert on the eve of litigation that such a policy exists, but the record contains no support for their assertion. Their testimony, without any other factual support, is not only hollow, but it is based on a foundation of quicksand.

Director Life testified that the production of Corpus Christi at issue was approved by the five-member faculty committee that he chaired./4 If the play offered for presentation happened to be anti-Semitic, overtly racist, or derogatory towards those who choose "alternative lifestyles," there is little doubt that it would have been rejected by the Theater Department's five-member faculty screening committee. The university has an anti-harassment policy in its Code of Student Conduct that Chancellor Wartell admits applies to the Theater Department. This policy prohibits conduct towards an identifiable group of persons that has the purpose or effect of creating a hostile educational environment. The policy goes on to state that IPFW is committed to recognizing the "worth and dignity of every person" and "fostering tolerance, sensitivity, understanding and mutual respect . . . ." The policy also provides for sanctions for conduct "motivated by bias against a person's race, gender, religion, color, age, national origin, ancestry, or disability," but the policy was not applied in this case. Why? Possibly, the university has in other instances invoked its anti-harassment policy to prohibit the production of other offensive plays, or perhaps it has not, but the record is silent on this question. If the IPFW has offered some groups--whether they be homosexuals, blacks, or Muslims--the

protection of an anti-harassment policy, while in this case denying it to Christians and allowing intolerance, disrespect, and hostility towards their beliefs, then IPFW has engaged in a double standard, which, in my view, is violative of the Constitution.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." Rosenberger, 515 U.S. at 828. "Discrimination against speech because of its message is presumed to be unconstitutional." Id. (emphasis added). If IPFW engages in viewpoint discrimination, not necessarily by allowing the performance of an anti-Christian play, but by refusing to allow the performance of plays similarly derogatory towards other groups, then their actions are unconstitutional. Cf. Grossbaum v. Indianapolis-Marion County Bldg. Auth., 63 F.3d 581, 591-92 (7th Cir. 1995) (in which a county that made the lobby of public building available for members of the public to display exhibits engaged in viewpoint discrimination in violation of the First Amendment where it refused to allow the display of a menorah). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Rosenberger, 515 U.S. at 828.

Fairness and equity dictate that IPFW must maintain an environment in which all of its students--whether they be Protestants, Moslems, Christians, Jews, or any religious, racial or ethnic minority--are free from all forms of harassment and intolerance. At this juncture in the proceed-ings, the record is not sufficiently developed to determine whether the university has engaged in viewpoint discrimination. On the state of the record and the case law presented herein, the panel should therefore grant plaintiffs-appellants' motion for a stay pending appeal in order that further discovery can be had on whether the university has truly respected the boundaries it has allegedly set regarding the production of any play, no matter its content, if the request were "brought up through the theater department in standard form," as Chancellor Wartell testified.

I am sorry that the Chancellor of a university as highly respected as the institution involved did not see fit to move this foul, disparaging, hate-motivated production off the campus to a private facility. In the final analysis, Corpus Christi serves no purpose other than possibly inciting the citizenry against Christianity, resulting in the promotion of hatred and disunity.

For all of these reasons I respectfully dissent, and would grant the stay in order that a more complete record can be made.

FOOTNOTES

/1 State action violates the Establishment Clause if it fails to satisfy any of the three prongs of the Lemon test. Edwards, 482 U.S. at 583.

/2 I find it ironic that the university's Code of Student Rights, Responsibilities and Conduct proscribes any conduct that either discriminates on the basis of religion or that stigmatizes any individual on the basis of race, ethnicity, ancestry, gender, or sexual orientation. Indiana University Purdue University Indianapolis Code of Student Rights, Responsibilities, and Conduct, sec. I(A) (August 15, 1997).

/3 Given the complete lack of evidence supporting the district court's finding of a limited public forum, the majority's reliance on another basis for upholding the trial court is not surprising.

/4 The record discloses that Gilbert's initial request to perform Corpus Christi was rejected by the faculty review committee in a unanimous vote, and that his second request, not a year later but a mere four months later, was accepted (in a unanimous vote). The reason given by Chairman Life for this sudden change of heart was that Gilbert, in that short time frame, had taken "several directed studies in directing."